OPINION
{¶ 1} The appellant, Jonathan Weatherholtz, appeals the November 8, 2002 judgment of conviction and sentencing of the Court of Common Pleas of Wyandot County, Ohio.
 {¶ 2} On December 12, 2001, the appellant was indicted by the Wyandot County grand jury for two counts of rape, one count of aggravated burglary, one count of kidnapping, and one count of felony domestic violence. These charges stemmed from an incident on December 4, 2001, wherein the appellant's estranged wife, Angela, informed the police that the appellant entered her home without her consent, forced her to repeatedly engage in sexual acts with him, duct taped the two of them together, threatened to commit suicide and subsequently attempted to do so, and threatened to kill members of her family.
 {¶ 3} At the time of this incident, a civil protection order ("CPO") was in effect, ordering the appellant not to contact Angela, to refrain from entering her place of residence, and not to come within 100 yards of her or her place of residence. In addition, the appellant had previously been arrested for allegedly assaulting Angela on September 15, 2001, and was released from custody on bond on December 3, 2001, one day prior to the incident at issue in this case, with the express condition that he have no contact, direct or indirect, with Angela and that he maintain at least 100 yards distance from her, her residence, and her place of employment.
 {¶ 4} The appellant pled not guilty to each count of the indictment, and the case proceeded to a three-day jury trial on October 1-3, 2002. During the trial, both Angela and the appellant testified. While conceding that he violated the CPO and the conditions of bond and engaged in various sexual acts with Angela on December 4, 2001, the appellant maintained that his sexual conduct with Angela occurred with her consent. At the conclusion of the State's presentation of evidence, the appellant made a motion for acquittal on all counts. The trial court denied this motion. However, the court found that the State did not present sufficient evidence that the appellant was previously convicted of domestic violence, a necessary element for a felony domestic violence conviction. Thus, the trial court instructed the jury as to the elements of a misdemeanor domestic violence charge rather than on a felony charge.
 {¶ 5} Following the trial, the jury found the appellant guilty of two counts of rape, one count of aggravated burglary, one count of kidnapping, and one count of misdemeanor domestic violence on October 4, 2002. The matter then proceeded to sentencing and a sexual offender classification hearing on November 5, 2002. The trial court classified the appellant as a sexual predator. The trial court also determined that the count of kidnapping merged with the two counts of rape as allied offenses of similar import. The court then sentenced the appellant to an eight year term of imprisonment on each count of rape, a four year term of imprisonment for the aggravated burglary conviction, and six months for the domestic violence conviction. The two counts of rape and the count for aggravated burglary were ordered to be served consecutively, and the six months imposed for the count of domestic violence was ordered to run concurrently with the other sentences for an aggregate total of twenty years. This appeal followed, and the appellant now asserts three assignments of error.
In an abuse of its discretion, the trial court reversibly erred byallowing the prosecution, over defense objection, to try its case againstthe defendant-appellant, on the state-assured prerequisite premise thatthe defendant-appellant had an enhancing prior domestic violenceconviction under O.R.C. § 2919.25(A), which in fact is not true,thereby violating evidence rules 401 and 402, and thereby resulting inprejudicially harmful denials of the fundamental guarantees of a fair jurytrial and due process of law, under the Sixth, Fifth and FourteenthAmendments to the Constitution of the United States.
In an abuse of its discretion, the trial court reversibly erred inoverruling defense objection to the harmfully prejudicial introduction ofprior acts evidence which was pejoratively reflective upon the characterof the defendant-appellant, in violation of evidence rules 404(A) and404(B), and thereby depriving the defendant-appellant of his fundamentalrights to a fair jury trial and to due process of law, as guaranteed bythe Sixth, Fifth and Fourteenth Amendments to the Constitution of theUnited States.
The jury's verdicts, with the trial court's acceptance of same, wereagainst the manifest weight of the evidence, thereby resulting inreversible error.
 {¶ 6} For ease of discussion, we elect to address these assignments of error out of turn.
 Third Assignment of Error {¶ 7} The appellant maintains that each finding of guilt as to each count was against the manifest weight of the evidence. In reviewing whether the verdict was against the manifest weight of the evidence, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Adkins (Sept. 24, 1999), Hancock App. No. 5-97-31, 1999 WL 797144, citing State v. Martin (1983), 20 Ohio App.3d 172,175; State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 8} In making this determination, there are eight factors to consider, which include "whether the evidence was uncontradicted, whether a witness was impeached, what was not proved, that the reviewing court is not required to accept the incredible as true, the certainty of the evidence, the reliability of the evidence, whether a witness' testimony is self-serving, and whether the evidence is vague, uncertain, conflicting, or fragmentary." State v. Apanovitch (1987), 33 Ohio St.3d 19,23-24, citing State v. Mattison (1985), 23 Ohio App.3d 10, syllabus.
 {¶ 9} In counts one and two, the appellant was charged with rape, a violation of R.C. 2907.02(A)(2). This section states: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C.2907.02(A)(2). The appellant admitted that he engaged in sexual conduct with the victim but maintains that this conduct occurred with her consent rather than with any purposeful compulsion by him.
 {¶ 10} The State presented the testimony of Angela Weatherholtz, who was in the process of divorcing the appellant when the incident occurred,[1] during the trial. Angela testified to the following events. On December 4, 2001, she came home from work at approximately 3:30 p.m. and found the appellant waiting for her inside her home. She then screamed and told him that he was not supposed to be there. The appellant grabbed her arm, sat her down in her living room, and began to question her about various rumors he heard while incarcerated about her dating other men. He also asked her how she would feel if she had to pick two members of her family to kill and then had to explain this to other members of her family. Angela further testified that the appellant showed her various letters that he had written to his children and told her to "make sure that his kids made it to his funeral" so that she would feel guilty about what she made him do. He then took her to the bedroom and told her to write a note, which read, "Went to Findlay with a friend. Be back at 9:30." The appellant then pulled a role of duct tape from between the mattress and boxspring, which Angela testified was not there when she left for work that morning, and used a piece of this to tape the note to the front door. Angela further testified that the appellant took her by the arm and walked her to the front door with him while he taped the note to the door and that she attempted to escape his grip but was unable to do so.
 {¶ 11} After taping the note to the door, the appellant led her back to the bedroom and continued to accuse her of having numerous boyfriends and asking why she "did the things [she] did to him." The two then began arguing over the various phone numbers that she kept on the refrigerator, which he had gone through while waiting for her to come home from work. Finally, the appellant told her that he was going to kill himself but that he was "gonna make love to [her] one more time." Angela then testified that she again tried to escape and that he prevented her from doing so and began disrobing her while she struggled to stop his advances. As she was struggling, the appellant made the following threat: "if you don't knock it off and stop getting loud, I'm gonna beat you so bad that you're not gonna be able to walk for six months after I get done with you." Angela testified that she ceased struggling and began to cry. She then described in detail how the appellant performed oral sex on her, required her to then perform oral sex on him, and forced her to engage in sexual intercourse with him twice. Throughout these acts, Angela testified, the appellant made repeated comments about the things she had done to him and what she was forcing him to do. In addition, the telephone rang two to three times, but she testified that the appellant would not allow her to answer it.
 {¶ 12} At some point during this incident, Angela wrapped herself in the top sheet of the bed and again attempted to escape, but the appellant prevented this and grabbed the sheet from around her body, throwing it to the floor. He then used the roll of duct tape to tape her two wrists to his left wrist and to tape her right leg to his left leg. He also told her that he was going to kill himself while taped to her so that everyone would know that he raped her before he died and that she caused him to kill himself. The appellant then ingested some of his medication that he brought with him; however, Angela did not know how many pills were in the bottle of medication. He then began to talk about how he had written things while in jail about what he was going to do to her when he was released. During this talk, the appellant became agitated and repeatedly punched the bed with his free hand. Eventually, the appellant removed the tape from Angela's wrists and permitted her to remove the tape from their legs, threatening to harm her if she did not remove the tape more quickly.
 {¶ 13} In an attempt to obtain her release, Angela told the appellant that she would not tell anyone what he had done to her if he freed her and agreed to give him a chance to reconcile their marriage. The appellant then allowed her to get dressed. While dressing, the telephone, which was located next to Angela, rang, and she answered it. The caller was Jeff Mullins, a co-worker and friend of Angela. Mullins sensed something was wrong and questioned Angela about it, but the appellant ordered her to "hang up the fuckin' phone," and she complied. The appellant then told her to take him to the home of Amy and Dennis Barth, friends of the appellant, and she, likewise, complied.
 {¶ 14} Upon arriving at the Barth home sometime between 7:30 and 8:00 p.m., she quickly exited the vehicle, leaving the motor running, and ran inside. Once inside, she told the Barths to keep the appellant away from her and began to cry and scream hysterically. The appellant followed her into the home and asked the Barths what she had said to them. Angela immediately left the home, with Amy Barth following her and questioning what was wrong. She then screamed for Amy to keep the appellant away from her, that he raped her, and that she wanted nothing to do with him. Angela then left and proceeded to her place of employment where Jeff Mullins was working when he phoned her. Angela told Mullins what had occurred at her home, and he gave her access to a telephone in order to call the police.
 {¶ 15} The police met Angela at her home where she relayed the events of that afternoon and early evening. She was then taken to the police department to write a statement of what had occurred. After she provided her written statement, she was transported to the emergency room, where she submitted to a rape exam.
 {¶ 16} During the State's examination of Angela, the prosecutor asked her why she behaved in the manner that she did during the events that day. She responded that she did not want to be injured by the appellant like she was on September 15, 2001. During that incident, the appellant repeatedly hit her when she resisted, and she testified that she was only able to obtain her freedom that day by acquiescing to whatever demands he made. Therefore, Angela testified that she was attempting to ascertain the best way out of the situation based upon the September incident.
 {¶ 17} The State also presented the testimony of Jeff Mullins. Mullins, who was working the second shift on the day of the incident, testified that he called Angela at her home three times from work but that all of his calls went unanswered except for the last call. He further testified that Angela answered his last call to her home and that she sounded as if she was crying. When he asked her what was wrong, she then told him that she had to go and hung up the phone. Mullins was later paged at work. When he responded to his page, sometime between 8:30 and 9:00 p.m., Angela was there crying and her face was red. When she told him what occurred, he took her to the office and gave her the phone to call the police.
 {¶ 18} Officer Michael Gullifer, who responded to Angela's home after she called the police, also testified on behalf of the State. He testified that he questioned Angela shortly before 9:00 p.m. about the events of that evening and that she began crying while describing what had happened to her. His testimony regarding her description to him of what had occurred supported the testimony that she provided during the trial. He also testified that she appeared as if she had been through an "awful ordeal." He then testified that he had another officer take her to the police department while he remained and collected evidence. Officer Gullifer then photographed the scene. Included in these photographs, which were admitted into evidence, were a photo of the broken back door jam, a photo of the appellant's ball cap on the couch, a photo of a top sheet lying on the floor in Angela's bedroom, and a photo of a roll of duct tape lying next to a wadded ball of duct tape on the dresser. These photos also supported the testimony provided by Angela regarding the incident.
 {¶ 19} Lieutenant Eric Parks of the Upper Sandusky Police Department also testified during the trial. He testified that he questioned the appellant on December 5, 2001, about the events that transpired the previous day. Lt. Parks stated that the appellant admitted to entering the home without permission through the back door because he did not want to be noticed because of the CPO. In addition, the appellant told him that Angela was shocked to see him there and that he had her put a note on the door so that they would not be disturbed because he wanted "time to work things out." The appellant admitted to having only consensual sex with Angela. Although Lt. Parks repeatedly asked if anything odd occurred while they were having sex, the appellant did not admit to using duct tape until Lt. Parks specifically asked him about duct tape. The appellant then admitted to duct taping Angela during their first act of intercourse but stated that the use of duct tape was not unusual for them. The appellant also informed Lt. Parks that he heard rumors from other inmates that Angela was dating other people while he was in jail, which upset him. Further, the appellant told Lt. Parks that all he had to do while in jail was pace his cell and think "24/7" about what she was doing.
 {¶ 20} Amy Barth also testified about the events of December 4, 2001. Although she did not testify that Angela told her that the appellant raped her, Amy's testimony as to the events at her home that evening otherwise fully supported the testimony provided by Angela regarding the way she abruptly entered and left the Barth home, crying and screaming for them to keep the appellant away from her. In addition, Amy testified that she and her husband asked the appellant what had happened that night but he answered that he did not want to discuss it.
 {¶ 21} The State also presented the testimony of the emergency room nurse who examined Angela that night, Laurie Rowe. Nurse Rowe testified that Angela informed her that she had been raped and duct taped by her estranged husband. Upon examination, Nurse Rowe did not observe any signs of trauma but did notice adhesive residue on Angela's wrists and leg, which she photographed. These photographs were also submitted as evidence.
 {¶ 22} Lastly, the appellant, himself, testified about the December 4, 2001 incident. His version of events was drastically different from that of Angela. Again, he admitted that they engaged in sexual conduct. However, he testified that they engaged in more acts than what Angela's testimony was and that both of them climaxed several times. However, Angela admitted to having climaxed once while the appellant performed oral sex on her but that she did so involuntarily and only after being told by the appellant that she had better pretend to enjoy what he was doing to her. The appellant also testified that both of them cried when they discussed how their marriage had failed but that Angela was not crying as they drove to the Barth residence. He further testified that Angela chose to write the note and that he, alone, taped the note to the door while Angela was in another room. However, Angela testified that the appellant kept her in his sight the entire time, and Lt. Parks testified that the appellant told him that he and Angela were always in the same room that afternoon.
 {¶ 23} Here, the jury, as the finder of fact, was best able to view the witnesses and judge their credibility. Although the appellant maintains that Angela was not a credible witness, the jury found him guilty of two counts of rape. Given Angela's extensive details of the event, which remained consistent throughout questioning by two different police officers at different times, her statement to the emergency room nurse later that evening, and her testimony at trial, which was consistent with the photographs admitted during the trial and with the testimony of other witnesses, we cannot conclude that the jury clearly lost its way or created such a manifest miscarriage of justice that the appellant's conviction must be reversed and a new trial ordered.
 {¶ 24} The appellant was also convicted of aggravated burglary in violation of R.C. 2911.11(A)(1). This section, in relevant part, states: "No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person * * * is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply: (1) The offender inflicts, or attempts or threatens to inflict physical harm on another[.]" R.C. 2911.11(A)(1).
 {¶ 25} Once again, the appellant admitted that he entered his estranged wife's home without permission, knowing that she was due home from work around that same time. The appellant also admitted that he entered the home through the back door because he did not want to "stand around out front with the protection order being on." He further testified that he knew that he could gain access to the home by using the back door because it did not lock and that once in the home he looked at various phone numbers that Angela kept on the refrigerator. In addition, Lt. Parks testified that the appellant told him that he waited for Angela to come home from work and that she screamed and seemed shocked when she saw him in her home. Angela also testified that she screamed when she saw the appellant in her home and that he told her that he was there to kill himself but that he wanted to have sex with her one last time before he died. She further testified that the appellant knew the back door could not be locked because he broke the door jam when he pushed through the door during the September 15, 2001 incident. Moreover, as previously noted, Angela testified that the appellant forced her to have both oral sex and sexual intercourse with him.
 {¶ 26} Although the appellant maintains that their sexual acts were consensual and that he merely went to the home to discuss their divorce, the jury was free to disregard this testimony as not credible. In addition, the testimony supplied by the other witnesses, as well as the appellant's own admissions, provided ample evidence by which the jury could reasonably conclude that the appellant committed aggravated burglary by entering Angela's home without her permission through a door that he knew would not lock with not only the intent to violate the CPO and the conditions of his bond but also to kidnap and forcibly rape his estranged wife, which he repeatedly did. Thus, this verdict was not against the manifest weight of the evidence.
 {¶ 27} The jury further found the appellant guilty of kidnapping in violation of R.C. 2905.01(A)(4). This statutory section states, in pertinent part: "No person, by force, threat, or deception, * * * by any means, shall * * * restrain the liberty of the other person, for any of the following purposes: * * * (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]" R.C. 2905.01(A)(4). Given the evidence previously discussed, the jury could reasonably have concluded that the appellant forcibly restrained his wife's liberty in order to engage in sexual activity against her will. Thus, this verdict was not against the manifest weight of the evidence.
 {¶ 28} Lastly, the appellant was convicted of domestic violence, a violation of R.C. 2919.25(A), which states: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Again, given the evidence presented, reasonable minds could have concluded that the appellant caused physical harm to his wife. Therefore, this verdict, along with the other four counts, was not against the manifest weight of the evidence, and the third assignment of error is overruled.
 Second Assignment of Error {¶ 29} In his second assignment of error, the appellant maintains that the trial court erred in allowing the State to introduce evidence of prior acts committed by the appellant, namely the events of September 15, 2001, involving the appellant and Angela Weatherholtz. This Court's analysis of this issue begins by noting that "the decision of whether or not to admit evidence rests in the sound discretion of the [trial] court[.]" Wightman v. Consolidated Rail Corp. (1999), 86 Ohio St.3d 431,437, citing Peters v. Ohio State Lottery Comm. (1992), 63 Ohio St.3d 296,299; see, also, State v. Sage (1987), 31 Ohio St.3d 173, 182. Thus, this Court will not disturb the trial court's decision unless it is unreasonable, arbitrary, or capricious. In addition, this abuse of discretion must have materially prejudiced the defendant. State v. Lowe
(1994), 69 Ohio St.3d 527, 532, citing State v. Maurer (1984),15 Ohio St.3d 239, 265.
 {¶ 30} The Rules of Evidence prohibit the use of "other crimes, wrongs, and acts * * * to prove the character of the accused in order to show that he acted in conformity therewith." Evid.R. 404(B). However, both the Rules of Evidence and Ohio statutory law provide exceptions to this rule. Evidence Rule 404(B) states that prior bad acts evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Furthermore, the Revised Code provides
In any criminal case in which the defendant's motive or intent, theabsence of mistake or accident on his part, or the defendant's scheme,plan, or system in doing an act is material, any acts of the defendantwhich tend to show his motive or intent, the absence of mistake oraccident on his part, or the defendant's scheme, plan, or system in doingthe act in question may be proved, whether they are * * * prior orsubsequent thereto[.]
R.C. 2945.59. However, "R.C. 2945.59 must be strictly construed against the state[,]" as it is an exception to the general rule of the prohibition of character evidence. State v. Burson (1974),38 Ohio St.2d 157, 158 (citation omitted).
 {¶ 31} In order to admit evidence of prior bad acts, not only must such evidence tend to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[,]" there must also be "substantial proof that the alleged other acts were committed by the defendant." Lowe, 69 Ohio St.3d at 530, citing State v.Broom (1988), 40 Ohio St.3d 277, 282-283. In addition, there are "those situations where other acts `form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment,' and which are `inextricably related to the alleged criminal act.'" Lowe, 69 Ohio St.3d at 531, quoting State v. Curry (1975),43 Ohio St.2d 66, 73. Such evidence is admissible under Evid.R. 404(B).Lowe, supra.
 {¶ 32} Here, the appellant maintains that the testimony surrounding events that occurred on September 15, 2001, was inadmissible pursuant to the Rules of Evidence. We disagree. During the trial, Angela testified that she did not continue to fight the appellant's advances because she did not want to be treated like she was on September 15, 2001, by the appellant. In addition, she testified that this previous incident taught her how to escape from the appellant by acquiescing to his demands. Thus, the trial court found that this went to the victim's state of mind. This finding was not an abuse of discretion given the fact that the appellant's version of the events was that Angela consented to their sexual liaison rather than him having forced her to do so.
 {¶ 33} Further, these two events had many similarities. Both incidents involved the appellant entering the home through the back door without permission to do so. Angela also testified that on both occasions she screamed and attempted to escape but that the appellant was able to prevent her from escaping. The September incident also involved an attempt by the appellant to kill himself by repeatedly injecting himself with insulin for his diabetes thirty-forty times. On both occasions, the appellant pulled Angela throughout the house by her arms, threatened her with violence, and made her lie on the bed with him. Additionally, the phone rang repeatedly during both events but the appellant prevented Angela from answering it. Furthermore, in both incidents, the appellant had Angela drive him to another location.
 {¶ 34} The December incident also demonstrated more detailed planning by the appellant to remain undetected and to prevent Angela from escaping. In September, according to Angela, the appellant was almost detected when Angela tried to scream for help when a friend of hers came to her home. Yet, in December, Angela testified and the appellant admitted that he had her write a note and place it on the front door so that they would not be disturbed. In addition, the appellant used duct tape to keep Angela with him while he talked to her and took his medication, apparently attempting to kill himself.
 {¶ 35} The testimony regarding the September incident tended to prove, not only the victim's state of mind and whether she consented to the appellant's actions, but also the appellant's plan, motive, and intent regarding the aggravated burglary, subsequent kidnapping and rapes, and the domestic violence he inflicted upon his estranged wife. The prior incident was not used to show his bad character and that he acted in conformity therewith, but rather, was used to demonstrate the appellant's plan to rape his wife and the motive behind it as well as to discredit his testimony that he went to her home simply to work things out between them. Thus, the trial court did not abuse its discretion in admitting this evidence, and the second assignment of error is overruled.
 First Assignment of Error {¶ 36} Appellant next asserts that the trial court improperly permitted the State to present evidence regarding a prior conviction for domestic violence. In its opening statement to the jury, the State read the indictment against the appellant. Included in this recitation was the allegation that the appellant committed domestic violence against his estranged wife on December 4, 2001, and had a prior conviction for domestic violence in 1989, which increased the degree of this offense from a first degree misdemeanor to a fifth degree felony. Counsel for the appellant objected to the reading of the indictment but did not specifically object to the allegation that the appellant was previously convicted of domestic violence. The trial court overruled this objection, and the State completed its recitation.
 {¶ 37} At the conclusion of the State's opening statement, the appellant waived his opening, and the State called its first witness, Richard Grafmiller, the Upper Sandusky Municipal prosecutor. Grafmiller identified the appellant[2] and testified that the appellant was convicted of domestic violence in the Upper Sandusky Municipal Court on March 29, 1989. In support of this testimony, the State introduced two exhibits, labeled "Exhibit 2" and "Exhibit 2-A." Grafmiller testified that Exhibit 2 was a certified copy of a docket entry of Upper Sandusky Municipal Court, which noted that the appellant was convicted of domestic violence. However, this exhibit did not contain the signature of a judge and/or magistrate. Grafmiller further testified that Exhibit 2-A was a certified copy of a journal entry of the Upper Sandusky Municipal Court, bearing the signature of Judge Osborne, the municipal court judge, and reflecting that the appellant was convicted of domestic violence and sentenced on March 29, 1989. The State then requested that both exhibits be admitted into evidence. Despite the objection of counsel for the appellant, the trial court admitted both exhibits.
 {¶ 38} At the end of the State's presentation of evidence, the appellant requested that the jury not be instructed on the count of domestic violence under the felony enhancement because the State did not present sufficient evidence regarding the prior conviction. The trial court agreed, determining that the record was devoid of any evidence that the prior conviction about which Grafmiller testified was the same or similar to R.C. 2919.25(A). Thus, the trial court found Exhibits 2 and 2-A to no longer be relevant and excluded them from admission into evidence. However, the appellant did not request that the trial court strike Grafmiller's testimony or specifically instruct the jury that it was to disregard any reference to the prior domestic violence conviction nor did the trial court do so sua sponte. Rather, at the conclusion of all the evidence and closing arguments, the trial court provided an instruction to the jury for a misdemeanor domestic violence charge rather than the felony enhancement without addressing Grafmiller's testimony.
 {¶ 39} The appellant now maintains that the State should not have been permitted to refer to the prior conviction for domestic violence or present evidence regarding a prior conviction, which he claims was unfounded, because of the prejudicial nature of this information. However, the appellant did not request that Grafmiller's testimony or the comments of the prosecutor during his opening statement be struck from the record nor did he object to the jury instructions, which did not include an instruction to disregard any such evidence and/or comments.
 {¶ 40} Having failed to raise this perceived error at trial when the court was in the best position to correct any such error, the appellant has waived all but plain error in this regard. In order to find plain error, Crim.R. 52(B) requires that there must be a deviation from a legal rule, the error must be an "obvious" defect in the trial proceedings, and the error must have affected a defendant's "substantial rights." State v. Barnes, 94 Ohio St.3d 21, 27, 2002-Ohio-68. Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. In addition, we note once again that "the decision of whether or not to admit evidence rests in the sound discretion of the [trial] court[.]" Wightman,86 Ohio St.3d at 437, citing Peters, 63 Ohio St.3d at 299. Thus, this Court will not disturb the trial court's decision unless it is unreasonable, arbitrary, or capricious and materially prejudiced the defendant. Lowe,69 Ohio St.3d at 532, citing Maurer, 15 Ohio St.3d at 265.
 {¶ 41} As previously discussed, the appellant was charged with domestic violence, specifically R.C. 2919.25(A). Ordinarily, a violation of R.C. 2919.25(A) "is a misdemeanor of the first degree." R.C. 2919.25(D). However, "[i]f the offender previously has pleaded guilty to or been convicted of domestic violence * * *, a violation of division (A) or (B) of this section is a felony of the fifth degree[.]" R.C. 2919.25(D).
 {¶ 42} The indictment alleged that the appellant was previously convicted of domestic violence on March 29, 1989. By making this allegation, the State sought to enhance the degree of the December 4, 2001 offense from a first degree misdemeanor to a fifth degree felony. "Where the existence of a prior conviction enhances the degree of a subsequent offense, it is an essential element of that offense that the state must prove beyond a reasonable doubt." State v. Nievas (1997),121 Ohio App.3d 451, 455, citing State v. Allen (1987), 29 Ohio St.3d 53,54; State v. Ireson (1991), 72 Ohio App.3d 235, 239. Thus, the State wasrequired to present evidence of the prior conviction to the jury in order to obtain a domestic violence felony conviction as alleged in the indictment. Although ultimately the State may not have satisfied its burden of proof, as determined herein by the trial court, the court did not err by permitting the State to attempt to prove one of the required elements of the offense. Thus, this testimony was permissible.
 {¶ 43} In addition, we note that informing the jury that it was to disregard the testimony and comments regarding a prior conviction and to not consider any such testimony in its deliberations may have been advisable, but the failure to do so did not constitute a deviation from a legal rule or an obvious defect in the proceedings, affecting a substantial right of the defendant, given the testimony and other evidence presented during the trial. Therefore, the first assignment of error is overruled.
 {¶ 44} For these reasons, the judgment of the Common Pleas Court of Wyandot County, Ohio, is affirmed.
Judgment affirmed.
Walters and Cupp, JJ., concur.
[1] At the time of the trial, Angela and the appellant were divorced.
[2] The appellant was identified through the use of a photograph because he adamantly refused, through the use of a number of expletives, to be present during much of his trial.